# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHESAPEAKE LAND DEVELOPMENT COMPANY LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) | NO. CIV-16-0132-HE |
| CHICAGO TITLE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

## ORDER

Plaintiff Chesapeake Land Development Company, L.L.C. ("Chesapeake") filed this action in state court against Chicago Title Insurance Company ("Chicago Title") and Capitol Abstract & Title Company ("Capitol Abstract") asserting claims related to its 2007 purchase of certain real property. Chicago Title removed the action on grounds of diversity jurisdiction after the state court dismissed Chesapeake's claims against Capitol Abstract, a nondiverse party. Chesapeake was granted leave to amend its complaint, *see* Doc. #41,[1] and Chicago Title filed a motion to dismiss pursuant to Fed.R.Civ.P.12(b)(6). Chesapeake then filed a motion for leave to file a second amended complaint, which the court has denied by separate order.

## Background

In the amended complaint, Chesapeake alleges that in 2007, prior to its purchase of two adjoining lots in Nichols Hills, Oklahoma (the "Property), it "engaged with" Chicago

---

[1] *References to documents are to the CM/ECF document and page number.*

Title and Capitol Abstract, its title agent. Plaintiff alleges that Capitol Abstract conducted a title investigation and discovered that both lots were burdened with specific use restrictions included in two 1954 deeds conveying the Property from G.A. Nichols Inc. and members of the Nichols Family to the Christian Science Society of Oklahoma City ("1954 use restrictions"). The deed for one lot limited its use to church purposes. The deed for the other provided that it could be used only as a park. Plaintiff alleges that when it learned of the use restrictions its agent, Joe Lewallen, informed Capitol Abstract that the restrictions would have to be removed from the Property before the sale closed. Capitol Abstract's representatives allegedly advised Mr. Lewallen that the restrictions could be removed at the time of sale by obtaining releases from the First Church of Christ, Scientist (the "Church"), the seller and then-current owner of the Property.[2]

Chesapeake alleges that before it bought the Property Mr. Lewallen asked Capitol Abstract whether the City of Nichols Hills (the "City") had an "interest or easement right associated with the City's park and jogging trail adjoining the Park Lot." Doc. #44, p. 3, ¶8. It claims "Capital Abstract representatives affirmatively advised Mr. Lewallen and Chesapeake that the City did not have any current ownership interest in the Park and further stated that the releases that Capital Abstract would obtain from the Church would effectively eliminate such interests, if any." *Id.* Chesapeake alleges it then purchased the

---

[2] *The use restrictions were also included in two 1956 deeds that conveyed the Property from the Christian Science Society to Chesapeake's seller, the First Church of Christ, Scientist. Doc. #47, pp. 10, 20-21.*

property for $10,000,000,[3] obtained the releases from the seller and simultaneously purchased a title insurance policy in the amount of $10,000,000 on the Property from defendant Chicago Title.

Chesapeake alleges it entered into sales negotiations for the Property in late 2014. During the sales process it allegedly discovered the Property was still burdened by the earlier 1954 use restrictions. When they prevented the sale from being completed, plaintiff submitted a claim of loss to Chicago Title, asking it to perform its duties under the title policy so the sale could be finalized. Plaintiff alleges that, although defendant accepted the claim under a reservation of rights on May 11, 2015, and took the position that the claim was covered under the policy, it failed to take steps to "alleviate the title issue to the Property for several months," and the third-party offer to buy the Property was rescinded. Doc. #44, p. 5, ¶11.

Plaintiff alleges defendant, instead of "properly respond[ing] to the demands of its insured to cure the burdens/ownership issues on the Property and/or to pay Chesapeake under the Title Policy," modified its original acceptance of plaintiff's claim on October 12, 2015, by insisting on the right to attempt to cure the defects caused by the use restrictions. *Id*. at ¶12. Defendant hired attorney Mel McVey in late 2015, plaintiff alleges, "[m]ore than seven (7) months after Chesapeake submitted its initial claim and after the Property sale had failed," to investigate and cure the defective title issues on both lots. *Id*. at ¶13.

---

[3] *Although the amended complaint does not allege the purchase date, Chesapeake apparently bought the Property in June 2007 from the First Church of Christ, Scientist. See Doc. Nos. 47, p. 10; 44-3, p.3 (effective date of policy).*

In early 2016, McVey allegedly confirmed that the "Park lot" part of the Property was "likely burdened with an implied easement or right-of-way belonging to the City of Nichols Hills." *Id.* at ¶14.

Plaintiff alleges there is no indication that Capital Abstract took any reasonable steps to determine the validity of the City's possible easement rights in 2007, when plaintiff's counsel asked about it, or that defendant investigated the issue after plaintiff made its demand in March, 2015. Plaintiff asserts that even if the use restrictions are removed from the Property, the City's possible implied easement both restricts its ability to sell or develop the property and has diminished its value. Plaintiff alleges that defendant refused to pay it any amount owed under the title policy for over 18 months and offered less than 3% of the total policy coverage amount when it finally made a payment offer. Plaintiff asserts breach of contract and bad faith claims against defendant, which defendant asserts should be dismissed with prejudice for failure to state a pursuant to Fed.R.Civ.P. 12(b)(6).[4]

Breach of contract

Chesapeake claims Chicago Title breached the title policy by failing to provide coverage for the loss or damages it sustained due to the use restrictions and by not resolving the title issue involving the implied easement. Chicago Title contends Chesapeake fails to state a breach of contract claim based on the use restrictions because they do not encumber

---

[4] *When considering whether a plaintiff's claim should be dismissed under 12(b)(6), the court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff as the nonmoving party.* S.E.C. v. Shields, *744 F.3d 633, 640 (l0th Cir. 2014).*

4

the title or make it unmarketable and because they were expunged by the Oklahoma Marketable Record Title Act. It contends Chesapeake fails to state a breach of contract claim based on the implied easement because Chesapeake sued before making a claim under the policy, so its claim is premature, because the path is open and notorious, so it is not considered to be a defect in the title or to render the title unmarketable, and because Chesapeake has not alleged it has been damaged as a result of the easement.

The parties appear to agree that Oklahoma law applies to the issues involved in this diversity case and there is no apparent reason to question that.[5] "In Oklahoma, '[a]n insurance policy, like any other contract of adhesion, is liberally construed, consistent with the object sought to be accomplished, so as to give a reasonable effect to all of its provisions, if possible.'" Emcasco Ins. Co. v. CE Design, Ltd., 784 F.3d 1371, 1378 (10th Cir. 2015) (quoting Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991)). Its construction should be natural and reasonable, "'to effectuate its purpose'" and it should be "'viewed in the light of common sense so as not to bring about an absurd result.'" *Id.* (quoting Wiley v. Travelers Ins. Co., 534 P.2d 1293, 1295 (Okla.1974)). Policy terms are construed "in their plain and ordinary sense if they are unambiguous, clear and consistent." *Id*. If the policy language is doubtful and susceptible to more than one construction, then the court will "interpret the policy language most favorably for the insured and against the insurer." *Id.*

---

[5] *The policy provides that "[t]he law of the situs of the land" shall apply to any arbitration, but appears to be silent as to choice of law in other contexts. See Doc. #44-3, p. 7, ¶14.*

The pertinent parts of the title policy issued by Chicago Title provide that, subject to identified exclusions, exceptions, conditions and stipulations, Chicago Title

> insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:
>
> 1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
>
> 2. Any defect in or lien or encumbrance on the title;
>
> 3. Unmarketability of the title;
>
> 4. Lack of a right of access to and from the land.

Doc. #44-3, p. 1. The policy defines "unmarketability of the title" as "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." *Id.* at p. 6, ¶ 1(g). The term "encumbrance" is not defined.

The policy specifically allows Chicago Title, when presented with a claim under the policy, to pay the policy limits to the insured, pay or settle with parties challenging the insured's title or "institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured." *Id.* at p.6, ¶¶4(b), 6(a),(b). If Chicago Title cures unmarketability of title or removes the alleged defect, lien or encumbrance and accomplishes this in a reasonably diligent manner, it "shall

6

have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby." *Id*. at p. 7, ¶9(a).

Use Restrictions

Chicago Title initially asserts that Chesapeake's breach of contract claim based on the use restrictions fails as a matter of law because use restrictions do not affect the marketability of Chesapeake's title. They may, it contends, "limit the desirability, and thus 'saleability,' of the Property, but they do not affect the marketability of its title." Doc. #47, p. 16. Therefore, Chicago Title argues, its failure either to eliminate the use restrictions or pay Chesapeake for the alleged diminution in value caused by the existence of the restrictions, cannot be a breach of the insurance contract. Chicago Title asserts that "[t]he majority of the courts to consider the issue have concluded that the 1954 Use Restrictions do not encumber title or render it unmarketable."[6] *Id.*

Defendant cites only one Oklahoma decision on this issue, <u>Choate v. Lawyers Title Ins. Corp</u>, 385 P.3d 670 (Okla. Ct. App. 2016). In <u>Choate</u>, the plaintiff alleged that decisions a city had made regarding his property, which predated his purchase, affected the title. After a fire had severely damaged a building on the plaintiff's property, the city razed the building, allegedly in accordance with a prior "irrevocable commitment." *Id.* at 673. The court concluded the plaintiff's allegations "relate solely to the physical condition of the land" and that, "[a]lthough the loss of the Building may affect the value of the land . .

---

[6] *Chicago Title asserts, and Chesapeake apparently does not disagree, that the releases of deed restrictions Chesapeake obtained from the Church effectively terminated the 1956 use restrictions. It is not altogether clear that releases executed by First Church of Christ, Scientist would necessarily resolve the issue.*

7

. it does not affect *title* to the same." *Id*. at 680. That determination is in accord with decisions reached by many courts from other jurisdictions, which recognize a distinction between a property's economic marketability and the marketability of its title. The cases defendants relies on, however, present different types of use restrictions in factually different contexts from the situation before this court. They are concerned with such things as whether "defects in physical conditions – like a lack of access – that affect the use of the land," Fid. Nat'l Title Ins. Co. v. Woody Creek Ventures, LLC, 830 F.3d 1209, 1215 (10th Cir. 2016), or restrictions imposed by building and zoning laws, such as a wetlands classification, Bear Fritz Land Co. v. Kachemak Bay Title Agency, Inc., 920 P.2d 759 (Alaska 1996) are covered by title insurance because they render a title unmarketable.[7] Regardless, "the weight of authority recognizes that a lack of economic marketability doesn't equate to nonmarketable title." Woody Creek Ventures, LLC, 830 F.3d at 1218. In other words, a defect or restriction may affect the property's value or its economic marketability, but it does not necessarily affect or limit the seller's ability to convey title.

As noted, the facts of this case are dissimilar from those cited by defendant in that the restrictive covenants limit the actual use to which the property can be put rather than what could be built on it. They also do not affect access to the Property or relate to defects

---

[7] *Other cases cited by defendant in which the courts concluded that the asserted defects did not affect title marketability include* Pavilion Park, LLC v. First Am. Title Ins. Co., *2011 WL 43222 (W.D. Ky. 2011) (restrictive covenant mandated property could not be developed absent remediation due to prior use as a solid waste disposal site);* McGonagle v. Stewart Title Guar. Co., *432 S.W.3d 535 (Tex. App. 2014) (dedication instrument required bungalow on purchased site to be relocated); and* Camp v. Commonwealth Land Title Ins. Co., *787 F.2d 1258, 1261 (8th Cir. 1986) (construction flaw in house on property violated restrictive covenant).*

8

in physical conditions on it. However, the conclusion reached in those cases -- that the phrase "unmarketability of the title" in title insurance policies relates to defects which adversely affect ownership rights, not defects which merely diminish the property's market value -- applies here. "An individual [or entity] can hold clear title to a parcel of land, although the same parcel is valueless or considered economically unmarketable because of some restriction or regulation on its use." Bear Fritz Land Co., 920 P.2d at 762-63. The two restrictive covenants at issue may affect the manner in which the parcels can be used and their economic marketability, but they do not necessarily impact title to the property. *See* Woody Creek Ventures, 830 F.3d at 1217-18 (collecting cases). The court concludes the amended complaint does not state a basis for a claim based on the "unmarketability of the title" clause of the insurance policy.

That clause is not, however, the only potential basis for coverage. The amended complaint also alleges a contract violation based on the policy's coverage of "encumbrances" on the title. While Chesapeake has failed to allege a basis for concluding its title is unmarketable as a result of the use restrictions, it has sufficiently alleged that the use restrictions constitute an encumbrance on the title. Although the policy does not define "encumbrance," a leading commentator defines the term as "a property interest held by a third person, including a lien, that diminishes the value of the property but does not impede the transfer of fee simple title." 5 New Appleman on Insurance Law §54.04[2][a]. Another states that "[t]he term 'encumbrance' is broader than 'lien' and includes a variety of rights or interest in land (e.g., liens, easements, or restrictive covenants) which may diminish the value of the encumbered property but which are not inconsistent with the transfer of fee

9

simple title."). 11 D. Thomas, Thompson on Real Property § 93.03(a)(2) (3d ed. 2015). Courts are in agreement. *See e.g.*, Feit v. Donahue, 826 P.2d 407, 410 (Colo. App. 1992) ("An encumbrance within the meaning of the covenant is a right or interest in the land which diminishes the value of, but is not inconsistent with the ability to convey, fee title.").

Under Oklahoma law, a restrictive covenant "creates an interest in real property" that is in the nature of an easement. Vranesevich v. Pearl Craft, 241 P.3d 250, 253-54 (Okla. Civ. App. 2009); *see generally* Goss v. Mitchell, 259 P.3d 886, 890-91 (Okla. Civ. App. 2011). The property interest created "is protectable as are other property interests." Vranesevich, 241 P.3d at 254. The court therefore concludes that the restrictive covenants alleged here are encumbrances within the meaning of the policy.[8]

The court concludes Chesapeake has sufficiently pleaded a breach of contract claim based on the use restrictions for purposes of Rule 12(b)(6), *see* Granite Springs Retreat Ass'n, Inc. v. Manning, 133 P.3d 1005, 1012 (Wyo.2006) ("Restrictive covenants limit permissible uses of land and are considered a cloud on title"), unless the use restrictions were expunged by the Marketable Record Title Act.

Marketable Record Title Act

Chicago Title argues that even if the use restrictions encumbered Chesapeake's title, they were expunged by the Marketable Record Title Act ("MRTA" or the "Act"). Pursuant

---

*[8] The cases cited by the parties are not particularly helpful. Most of defendant's cases focus on whether the alleged defect rendered the title unmarketable. While a few also address the question of whether coverage exists under a title policy because a restrictive covenant allegedly is an "encumbrance," they are distinguishable. E.g., McGonagle, 432 S.W.3d at 540 ("encumbrance" defined under Texas law [Tex. Prop. Code § 5.024] as "a tax, assessment or lien on real property"); Pavilion Park, 2011 WL 43222 (restrictive covenant precluded property development absent compliance with any government required site remediation).*

to the Act's provisions, if a person has an unbroken chain of title for at least thirty years, with no defects in that chain and no recorded instrument during that period which purport to divest that title, then the person has a marketable title. *See* 16 Okla. Stat §§71-85. Defendant's argument is premature and one not appropriate for resolution on a motion to dismiss. A motion to dismiss challenges the facial sufficiency of the complaint to state a claim. Defendant's argument based on the MRTA, by contrast, is in the nature of an affirmative defense or a basis for avoidance of liability it might otherwise have. The complaint does not allege facts sufficient to allow resolution of the potential applicability of the MRTA and the court declines to attempt such a resolution based on representations in the briefs.

Implied Easement

Chicago Title makes several arguments as to why Chesapeake's breach of contract claim based on the City of Nichol's Hill's jogging path/implied easement should be dismissed. However, it is necessary to discuss only one – the absence of any allegations of loss or damage in the amended complaint. *See* Choate, 385 P.3d at 678 ("To recover under a claim for breach of contract in Oklahoma, a plaintiff must show: 1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach."). The title policy "is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by [the] policy."[9] Doc. #44-3, p. 7, ¶7. Chesapeake has not, though, alleged

---

[9] *The policy also obligates Chicago Title to provide Chesapeake with a defense in certain litigation. See Doc. #44-3, p. 6, ¶4(a).*

that it has suffered loss or damage as a result of this implied easement. Rather, it alleges it lost the prospective sale of the Property due to the existence of the use restrictions discussed above. Doc. Nos. #44, ¶10; 44-4. It asserts that "[u]pon information and belief, Capital Abstract discovered that the City of Nichols Hills had a possible easement interest in the Property in mid-March of 2007," and "it is likely that the City holds an implied easement to the Property" and "it is also unlikely that the City will voluntarily cede its implied easement rights without significant compensation for the same." Doc. #44, p. 8, ¶¶22, 23. That is not enough to state a breach of contract claim under the policy terms. *See* Choate, 385 P.3d at 678 ("Title insurance 'is ordinarily considered a contract of indemnity' whose '*unique nature* makes it somewhat different from other breach of contract disputes.'") (quoting OPY I, L.L.C. v. First Am. Title Ins. Co., 350 P.3d 163, 165 (Okla. Civ. App. 2015)). Defendant's motion will therefore be granted with respect to plaintiff's breach of contract claim based on the the implied easement.

Bad Faith

Chicago Title asserts Chesapeake's remaining claim – based on its alleged breach of the implied duty of good faith and fair dealing – should be dismissed because the Oklahoma Supreme Court has not applied the tort to a commercial title insurance relationship. Defendant argues the policy considerations warranting its application in situations where a special relationship exists between the parties are not present here. Plaintiff disagrees.

It is well established that "[a]n insurer has an implied in law duty to act in good faith and deal fairly with its insured to ensure that the policy benefits are received ... the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive damages may be sought." Choate, 385 P.3d at 681 (quoting Christian v. Am. Home Assurance Co., 577 P.2d 899, 904 (Okla. 1977)). The Oklahoma Court of Appeal recognized in Choate that, while "[t]he Oklahoma Supreme Court has not expressly held this duty is owed by title insurers to its insureds, [it] has generally recognized an insurer's duty extends to all types of insurance companies and insurance policies." *Id.*

Other courts do not make the distinction defendant urges. Apparently without challenge, they generally impose the duty of good faith and fair dealing on title insurers, regardless of whether the insured is an unrepresented homebuyer or a sophisticated commercial entity. *See e.g.*, Fifth Third Mortg. Co. v. Chicago Title Ins. Co., 692 F.3d 507, 514 (6th Cir. 2012). The court concludes the Oklahoma Supreme Court, if squarely presented with the question, would likely apply the implied duty of good faith to title insurers, just as it does with other types of insurers. Defendant's motion to dismiss will therefore be denied with respect to plaintiff's bad faith claim.

Accordingly, defendant's motion to dismiss [Doc. #47] is **GRANTED IN PART** and **DENIED IN PART**. It is granted with respect to the breach of contract claim based on the implied easement and denied with respect to the breach of contract claim based on the use restrictions and the bad faith tort claim.

**IT IS SO ORDERED**.

Dated this 30th day of November, 2017.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE